883 F.2d 1418
 Dr. Gloria J. ROMERO, Willie E. White, Joseph Lee Duncan,
Tomas Ursua, and Harold Webb,
Plaintiffs-Appellants/Cross-Appellees,
v.
The CITY OF POMONA; G. Stanton Selby, Mayor of the City of
Pomona; Vernon M. Weigand, Councilman District 1; E.J.
Gualding, Councilman District 2; Donna Smith, Councilperson
District 3; Mark Nymeyer, Councilman District 4; In Their
Official Capacities, Defendants-Appellees/Cross-Appellants.
 Nos. 87-6326, 87-6517 and 88-5688.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 3, 1988.
Decided Aug. 24, 1989.
 
 Rolando L. Rios, San Antonio, Tex., William Garrett, Dallas, Tex., Richard P. Fajardo and E. Richard Larson, Los Angeles, Cal., for plaintiffs-appellants/cross-appellees.
 John E. McDermott and Erich R. Luschei, Los Angeles, Cal., for defendants-appellees/cross-appellants.
 Appeal from the United States District Court for the Central District of California.
 Before FLETCHER, ALARCON and KOZINSKI, Circuit Judges.
 KOZINSKI, Circuit Judge:
 
 I. Background
 
 1
 The plaintiffs, Gloria J. Romero, Willie E. White, Joseph Lee Duncan, Tomas Ursua and Harold Webb, eligible voters and residents of the City of Pomona, California, allege that that city's at-large districting plan impermissibly dilutes the right of black and Hispanic voters to elect candidates of their choice to the Pomona City Council.
 
 
 2
 These facts are not in dispute: Since its incorporation in 1888, Pomona has employed an at-large election system for choosing its mayor and four city council members. Under its 1911 Charter, the city is divided into four electoral districts. A candidate for city council competes only against other candidates residing in the same district, but must be elected by a majority of the voters city-wide; if no candidate in a district election achieves a majority, there is a runoff election between the two candidates who receive the most votes in the primary election. The mayor, who serves for two years and is also a member of the city council, is elected in a city-wide election and may reside in any district. City council members hold office for staggered four-year terms. Thus, the voters of Pomona elect the mayor and two city council members every other year.
 
 
 3
 As of the time the judgment below was entered, two Hispanics have been elected to the Pomona City Council: the first in 1967; the second in 1973 and again in 1977. See Romero v. City of Pomona, 665 F.Supp. 853, 856 (C.D.Cal.1987).[1] No black has served on the city council, although eleven have run for office in fourteen campaigns. According to the 1980 census, the City of Pomona's population is 92,742, of which 30.5% or 28,287 have Spanish surnames, 18.6% or 17,250 are black, and 46.7% or 43,318 are white. According to a 1984 update, the population total increased to 97,998, of whom 30.5% were Spanish-surnamed and 19% were black. As of 1984, blacks and Hispanics together made up 49.5% of Pomona's population.
 
 
 4
 Plaintiffs brought this action under section 2 of the Voting Rights Act of 1965, 42 U.S.C. Sec. 1973 et seq. (as amended June 29, 1982), seeking: (1) a declaration that the at-large system of electing members of the Pomona City Council unlawfully dilutes Hispanic and black voting strength; and (2) an injunction against future city council elections under the at-large system and requiring the implementation of a plan whereby city council members would be elected from wards or single districts.
 
 
 5
 The case proceeded to trial but, following plaintiffs' case-in-chief, the district court granted defendants' motion for involuntary dismissal under Federal Rule of Civil Procedure 41(b). Applying Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), decided after plaintiffs' presentation of their case-in-chief, the district court found that plaintiffs failed to establish any of the three threshold requirements for proving a violation of section 2 of the Voting Rights Act: (1) geographical compactness; (2) minority group cohesion; and (3) bloc voting by the majority. More specifically, the district court found that plaintiffs failed to prove that the black and Hispanic voters of Pomona comprised a politically cohesive group. Relying on exit polls of the March 1985 city council primary, the district court found that a majority of black voters supported the white opponents of the Hispanic candidate for City Council District 3, while a majority of Hispanic voters supported the white opponents of Joseph Duncan, the black candidate for City Council District 2. Romero, 665 F.Supp. at 858. The district court concluded that, in the absence of significant cross-racial electoral support, blacks and Hispanics could not be considered a single, politically cohesive group. Id. The district court also found that "[a]fter taking into consideration factors such as eligible voting age and citizenship, the evidence conclusively establishes that neither hispanics nor blacks can constitute a majority of the voters of any single member district." Id.
 
 
 6
 Perhaps out of an abundance of caution, the district court went on to apply the so-called "Senate" or "Zimmer" factors, see Thornburg, 478 U.S. at 36-37, 106 S.Ct. at 2758-59, and concluded that "the City has not used any of the enumerated voting practices or procedures to discriminate against hispanic or black voters." Romero, 665 F.Supp. at 868.[2]
 
 
 7
 Having prevailed on the merits, defendants moved for retaxing of costs for the production of exhibits under 28 U.S.C. Sec. 1920(4) (1982) and Local Rule 16.4.17(a). The district court denied this motion, along with defendants' motion for attorney's fees under Rule 11, 28 U.S.C. Sec. 1927 (1982) and 42 U.S.C. Secs. 1973l (e), 1988 (1982).
 
 
 8
 On appeal, plaintiffs argue that the Supreme Court's opinion in Thornburg significantly altered the requirements for proving a section 2 vote dilution claim. They suggest that the district court should have allowed them to present additional evidence made relevant under Thornburg. On the merits, they contend that the district court misapplied Thornburg by measuring geographic compactness by comparing eligible voters, rather than raw population totals, and by measuring the political cohesiveness of black and Hispanic voters by determining whether blacks and Hispanics voted in tandem, rather than determining whether the two groups voted differently from whites. Third, plaintiffs challenge the district court's failure to make detailed findings as to the Senate factors and the district court's "verbatim" and "wholesale" adoption of defendants' proposed findings of fact. Appellants' Opening Brief at 36, 37. Finally, they object to the district court's refusal of class certification. Defendants appeal the district court's denial of certain costs and attorney's fees.[3]
 
 II. Refusal to Reopen
 
 9
 Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), which interpreted the 1982 amendments to the Voting Rights Act, held that a violation may be proved "by a showing of discriminatory effect alone." Id. at 35, 106 S.Ct. at 2758.[4] In order to prove that the multidistrict voting scheme impermissibly diluted minority voting strength, plaintiffs had to show that "a bloc voting majority [is] usually ... able to defeat candidates supported by a politically cohesive, geographically insular minority group." Id. 478 U.S. at 49, 106 S.Ct. at 2766. The Court noted seven factors, the presence of which would tend to establish an impermissible scheme.[5] As a preliminary matter, however, plaintiffs had to show the existence of three threshold elements: (1) geographical compactness, (2) minority political cohesion, and (3) majority bloc voting. Id. at 50-51, 106 S.Ct. at 2766. As noted, the district court dismissed plaintiffs' case because it found they had failed to prove any of these elements.
 
 
 10
 Plaintiffs argue that, had they been given the opportunity to reopen, they would have presented further evidence on three issues: (1) the feasibility of redrawing city council district lines to create a single district in Pomona with a majority of black and Hispanic voters; (2) the political cohesiveness of minority voters; and (3) the impact of Pomona's at-large city council election system on the ability of minority voters to "influence" the election of preferred candidates.
 
 
 11
 "A motion to reopen for additional proof is addressed to the sound discretion of the trial judge." Contempo Metal Furn. Co. v. East Texas Motor Freight Lines, 661 F.2d 761, 767 (9th Cir.1981); accord United States v. Kelm, 827 F.2d 1319, 1323 (9th Cir.1987). Although a change of law may warrant reopening a case where plaintiff wishes to present evidence pertinent to the new legal standard, a change that does not "substantially affect" the burden of proof and was reasonably anticipated by existing law will not warrant reopening. See Skehan v. Board of Trustees, 590 F.2d 470, 479 (3rd Cir.1978), cert. denied, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979); 6A J. Moore, J. Lucas & G. Grotheer, Jr., Moore's Federal Practice p 59.04, at 33-34 (2d ed. 1987). Further, only "reasonably genuine surprise," Moylan v. Siciliano, 292 F.2d 704, 705 (9th Cir.1961); see also Air et Chaleur, S.A. v. Janeway, 757 F.2d 489, 495 (2d Cir.1985), combined with a reasonably specific description of the additional evidence made relevant by the change in the law, cf. Berns v. Pan American World Airways, 667 F.2d 826, 829 (9th Cir.1982), will justify reopening.
 
 
 12
 We agree with the district court that Thornburg did not announce such a fundamental, unanticipated or sweeping change in the law as to warrant reopening plaintiffs' case. First, Thornburg did not substantially alter plaintiffs' burden of proof; it merely explained which of the Senate factors were most relevant in proving a section 2 violation. Two of the "necessary preconditions," 478 U.S. at 50, 106 S.Ct. at 2766, discussed in Thornburg (minority group cohesion and majority bloc voting) were the component parts of one Senate factor--racially polarized voting. See Thornburg, 478 U.S. at 56, 106 S.Ct. at 2769 ("The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates."). Even prior to Thornburg, proof of polarized voting, or "[v]oting along racial lines," Rogers v. Lodge, 458 U.S. 613, 623, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982), was one of the cornerstones of a section 2 claim. See, e.g., McMillan v. Escambia County, 748 F.2d 1037, 1043 (5th Cir.1984); United States v. Marengo County Comm'n, 731 F.2d 1546, 1566 (11th Cir.), appeal dismissed and cert. denied, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984); Gingles v. Edmisten, 590 F.Supp. 345, 367, 374 (E.D.N.C.1984) (three-judge court), aff'd in part, rev'd in part sub nom. Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).
 
 
 13
 Thornburg, moreover, did not alter the statistical methods used to prove racially polarized voting. Both before and after Thornburg, plaintiffs, including plaintiffs in this case, utilized exit polls, ecological regression and homogeneous precinct analysis, and anecdotal testimony to show the existence of polarized voting. Thornburg merely confirmed what has been understood all along: proof of racially polarized voting is at the heart of any section 2 claim.
 
 
 14
 Plaintiffs clearly recognized this. Much of their proffered evidence was directed to showing that (a) blacks and Hispanics are politically cohesive and (b) that the minority's voting power was submerged by majority bloc voting.[6] Therefore, Thornburg's threshold requirements of minority political cohesion and majority bloc voting added nothing not already recognized by existing case law and the Senate factors.
 
 
 15
 Although Thornburg 's geographical compactness requirement was not among the enumerated Senate factors, see McNeil v. Springfield Park Dist., 851 F.2d 937, 942 (7th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989), its addition did not materially alter the burden of proving a section 2 claim. In fact, cases prior to Thornburg held that no section 2 claim could be brought unless plaintiffs demonstrated that the minority group was capable of forming a majority of voters in a single district. See, e.g., Latino Political Action Comm. v. City of Boston, 609 F.Supp. 739, 746-47 (D.Mass.1985), aff'd, 784 F.2d 409 (1st Cir.1986); Gingles v. Edmisten, 590 F.Supp. at 381 n. 3.[7] Plaintiffs have in fact attempted to show geographical compactness; they sought to prove that political cohesion of blacks and Hispanics together could comprise a majority in a proposed single-member city council district.[8] Moreover, plaintiffs offered alternative plans to show that existing precincts could be used to redraw districts to create a majority minority district. Because they attempted--albeit unsuccessfully--to demonstrate geographical compactness during their case-in-chief, plaintiffs cannot now claim surprise that Thornburg required such a showing.
 
 
 16
 Plaintiffs also contend that they should be afforded an opportunity to "establish political cohesiveness by methods other than vote analysis of city elections," Motion to Re-Open Plaintiffs' Case-in-Chief, Romero v. City of Pomona, C.A. No. 85-3359 JMI(Gx) (Aug. 28, 1986) at 4. However, Thornburg certainly did nothing to change the methodology by which political cohesiveness could be proved. Moreover, plaintiffs have failed to indicate what new evidence they intended to introduce to prove the political cohesiveness of Pomona's minority voters. See Air et Chaleur, 757 F.2d at 495 (plaintiff must show surprise and explain nature of proposed additional evidence to warrant remand following district court denial of motion to reopen).
 
 
 17
 Finally, plaintiffs suggest that they should have been permitted to reopen their case so they could demonstrate that Pomona's at-large plan diminished the ability of minority voters to influence the outcome of city council elections. Their argument is based on footnote 12 of Thornburg, which states:
 
 
 18
 We have no occasion to consider whether Sec. 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multimember district impairs its ability to influence elections.
 
 
 19
 478 U.S. at 46, 106 S.Ct. at 2764 (emphasis original). This language, which does nothing more than expressly leave open the question, did not change existing legal standards and therefore provides no basis for a motion to reopen.
 
 
 20
 Nor does Davis v. Bandemer, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), decided the same day as Thornburg, support plaintiffs' claim. Davis involved a constitutional challenge to a districting plan, and therefore required proof of discriminatory intent. Id. at 140-42, 106 S.Ct. at 2814-15. Plaintiffs raised an equal protection claim at trial, which the district court rejected on the ground that plaintiffs failed to prove discriminatory purpose. Romero, 665 F.Supp. at 869. Plaintiffs do not challenge this finding on appeal. It was not an abuse of discretion for the district court to refuse to reopen under Davis where the plaintiffs had already tried but failed to prove discriminatory intent.III. Geographical Compactness
 
 
 21
 Plaintiffs contend that the district court misapplied Thornburg 's "geographical compactness" test by focusing on the number of blacks and Hispanics eligible to vote, rather than on total minority populations. They suggest that Thornburg established total minority population, rather than the population of eligible voters, as the proper standard for measuring geographical compactness in a single-member district.[9] Alternatively, they contend that, because blacks and Hispanics are politically cohesive, they should be considered in tandem for purposes of determining geographical compactness.
 
 
 22
 A. The district court held that "only those individuals eligible to vote can be counted in determining whether a minority group can constitute a voting majority of a single-member district." Romero, 665 F.Supp. at 864. Applying this standard, the district court found that none of the districts proposed by plaintiffs[10] have majority Hispanic or black populations, once citizenship and voting age are considered[11]: "After taking into consideration factors such as eligible voting age and citizenship, the evidence conclusively establishes that neither hispanics nor blacks can constitute a majority of the voters of any single member district." Id. 665 F.Supp. at 858.[12]
 
 
 23
 Plaintiffs contend that the district court misread Thornburg, which, they argue, merely requires that plaintiffs demonstrate that the minority group constitute a majority of the total population in the single-member district. They are mistaken. Thornburg repeatedly makes reference to effective voting majorities, rather than raw population totals, as the touchstone for determining geographical compactness.[13] Indeed, the purpose of geographical compactness is to first determine whether minorities are capable of commanding a majority vote in a single-member district:
 
 
 24
 Unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. The single-member district is generally the appropriate standard against which to measure minority group potential to elect because it is the smallest political unit from which representatives are elected. Thus, if the minority group is spread evenly throughout a multimember district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure. As two commentators have explained:
 
 
 25
 "To demonstrate [that minority voters are injured by at-large elections], the minority voters must be sufficiently concentrated and politically cohesive that a putative districting plan would result in districts in which members of a racial minority would constitute a majority of the voters, whose clear electoral choices are in fact defeated by at-large voting."
 
 
 26
 478 U.S. at 50-51 n. 17, 106 S.Ct. at 2766 n. 17 (emphasis added) (brackets original) (quoting Blacksher & Menefee, From Reynolds v. Sims to City of Mobile v. Bolden: Have the White Suburbs Commandeered the Fifteenth Amendment?, 34 Hasting L.J. 1, 55-56 (1982)).
 
 
 27
 Cases before and after Thornburg acknowledge that a section 2 claim will fail unless the plaintiff can establish that the minority group constitutes an effective voting majority in a single-member district. See, e.g., McNeil, 851 F.2d at 945 ("Because only minorities of voting age can affect this potential [to elect candidates of their choice], it is logical to assume that the Court intended the majority requirement to mean a voting age majority."); Latino Political Action Comm., 609 F.Supp. at 746-47 (rejecting section 2 claim where plaintiffs failed to establish that minority voters could constitute an effective voting majority in a single-member district); Gingles v. Edmisten, 590 F.Supp. at 381 (for purposes of determining minority vote dilution, "effective voting majority" appropriate standard). More recently, in Gomez v. City of Watsonville, 863 F.2d 1407 (9th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989), our assessment of geographical compactness was based upon the number of eligible minority voters, rather than total minority population. Id. at 1414 (presence of two districts where "Hispanics would constitute a majority of the voters and would be able to elect representatives of their choice" satisfies Thornburg's geographical compactness standard) (emphasis added). The district court was correct in holding that eligible minority voter population, rather than total minority population, is the appropriate measure of geographical compactness.
 
 
 28
 B. Alternatively, plaintiffs contend that, for the purpose of satisfying Thornburg 's geographical compactness requirement, Hispanics and blacks can be considered a politically cohesive minority coalition, because white voters tend to vote differently from blacks and Hispanics in Pomona.[14] This claim is foreclosed, however, by the district court's finding that blacks and Hispanics in Pomona are not politically cohesive. The district court's finding was based in part on the 1985 city council primary elections, in which plaintiffs' exit polls revealed that 60% of blacks voted against the Hispanic candidate for District 3, Tomas Ursua, and in favor of white candidates. That same exit poll revealed that 71% of all Hispanic voters cast their ballots in favor of the white opponents of Joseph Duncan, a black candidate for District 2. Romero, 665 F.Supp. at 858. Based as they are on substantial evidence, these findings must be given great deference. See Thornburg, 478 U.S. at 79, 106 S.Ct. at 2781 ("[T]he application of the clearly-erroneous standard to ultimate findings of vote dilution preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law."). We therefore hold that the district court did not err in concluding that blacks and Hispanics were not politically cohesive and could not be combined to form a majority of the voters in any district.[15]
 
 
 29
 Because plaintiffs must meet all three Thornburg preconditions in order to succeed on a section 2 claim, id. at 50-51, 106 S.Ct. at 2766; see, e.g., City of Carrollton Branch of NAACP v. Stallings, 829 F.2d 1547, 1550 (11th Cir.1987), cert. denied sub. nom. Duncan v. City of Carrollton, Georgia, Branch of NAACP, --- U.S. ----, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); Collins v. City of Norfolk, 816 F.2d 932, 935 (4th Cir.1987); Buckanaga v. Sisseton Indep. School Dist., 804 F.2d 469, 471-72 (8th Cir.1986), we agree with the district court that plaintiffs' failure to show geographical compactness bars their section 2 claim.[16]
 
 IV. Motion to Retax Costs
 
 30
 Following the district court's grant of involuntary dismissal, defendants filed a Notice of Application for Costs together with a Bill of Costs, requesting $160,584.74 for costs expended in defense of the lawsuit, including $146,926.94 in expert witness fees, $5000 for duplication and exemplification and $8,657.80 for depositions. Without agreeing as to entitlement, the parties stipulated to the amount of costs taxable for exemplification and copies of papers ($3000) and for deposition transcripts ($6,837.10), totaling $9,837.10. The clerk awarded costs to defendants in that amount. Defendants then moved to retax to add $146,926.94 in expert witness fees, expended for research and analyses by Pomona's five expert witnesses.[17] Plaintiffs filed a cross-motion to retax, seeking to eliminate all costs. Both motions were denied by the district court. Because only defendants appeal, the sole issue we must consider is whether defendants were entitled to $146,926.94 in expert witness fees as taxable costs under 28 U.S.C. Sec. 1920 (1982).
 
 
 31
 Defendants argue that recoverable "exemplification" costs under section 1920(4) include not merely the cost of physical preparation of exhibits, but the expert research expenses incurred in assembling and preparing the content of those exhibits. Defendants maintain that the fees paid to the experts who assembled, analyzed and distilled the data incorporated into their trial exhibits are an integral part of the costs of exemplification and therefore should be recoverable under section 1920(4).
 
 
 32
 While we have never considered the issue, some other circuits have limited recovery under section 1920(4) to the actual costs of physically producing the exhibits. In Webster v. M/V Moolchand, Sethia Liners, Ltd., 730 F.2d 1035 (5th Cir.1984), the Fifth Circuit held that "the language of [Sec. 1920(4) ] seems to preclude its extension beyond the payment of the actual cost of exemplification and reproduction of copies." Id. at 1040. Similarly, in CleveRock Energy Corp. v. Trepel, 609 F.2d 1358 (10th Cir.1979), cert. denied, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980), the Tenth Circuit denied expert witness fees as "adjunct to the preparation of exhibits." Id. at 1363; accord Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561 (10th Cir.1961) (under Rule 54(d), accountant's fees incurred in connection with trial preparation in antitrust litigation not allowable), cert. dismissed sub. nom. Wade v. Union Carbide & Carbon Corp., 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962).
 
 
 33
 Defendants cite contrary authority from two other circuits. In EEOC v. Kenosha Unified School Dist., 620 F.2d 1220 (7th Cir.1980), the Seventh Circuit held that the district court may use "equity power to allow recovery of costs beyond the mere physical production of court materials." Id. at 1228. Kenosha, which relied on the district court's equitable powers, has been fatally undermined by the Supreme Court's recent decision in Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). Crawford held that, notwithstanding the district court's discretionary authority under Federal Rule of Civil Procedure Rule 54(d) to refuse to tax costs in favor of a prevailing party, a district court may not rely on its "equity power" to tax costs beyond those expressly authorized by section 1920: "The discretion granted by Rule 54(d) is not a power to evade this specific congressional command. Rather, it is solely a power to decline to tax, as costs, the items enumerated in Sec. 1920." Id. at 442, 107 S.Ct. at 2498; see also Maxwell v. Hapag-Lloyd Aktiengesellschaft, 862 F.2d 767, 770 (9th Cir.1988) (Crawford strictly limits reimbursable costs to those enumerated in section 1920).
 
 
 34
 Defendants also rely on In re Air Crash Disaster, 687 F.2d 626 (2d Cir.1982), where the Second Circuit construed section 1920(4) to allow recovery of "the expense of an expert's research and analysis in ... producing an exhibit." Id. at 631. We must part company with our sister circuit on this issue because we believe it has read section 1920 too broadly. Section 1920(4) speaks narrowly of "[f]ees for exemplification and copies of papers," suggesting that fees are permitted only for the physical preparation and duplication of documents, not the intellectual effort involved in their production. Were the term exemplification read any broader, it could well swallow up other statutory provisions of the Code and rules, such as the prohibition against the award of attorney's fees or expert witness fees in the normal case. See, e.g., 28 U.S.C. Sec. 1821(b) (1982) (limiting court-ordered award of witness fees to thirty dollars per day); 28 U.S.C. Sec. 1927 (1982) (attorney's fees may be awarded where attorney acted recklessly or in bad faith); Fed.R.Civ.P. 11 (allowing award of attorney's fees incurred in defense of bad faith motion or pleading); Fed.R.Civ.P. 26(b)(4)(C) (party seeking discovery may, under certain circumstances, be required to pay expert witness fees for time and effort expended in responding to discovery requests). See CleveRock, 609 F.2d at 1363. This is because any document "necessarily produced" for purposes of the litigation will contain somebody's intellectual input, be it a lawyer, an expert witness or a lay witness.
 
 
 35
 This case illustrates the problem with defendants' proposed construction. Defendants are asking the court to shift their expert witness costs to plaintiffs under the guise of exemplification costs. Reading section 1920(4) in pari materia with other applicable provisions precludes this result. We therefore affirm the district court's denial of the motion to retax costs.
 
 V. Attorney's Fees and Sanctions
 
 36
 Following the district court's grant of involuntary dismissal in favor of Pomona, defendants moved for attorney's fees, based on 28 U.S.C. Sec. 1927 and Rule 11 of the Federal Rules of Civil Procedure. The district court denied both requests and defendants appeal. "The imposition of sanctions under section 1927 requires a finding that counsel acted 'recklessly or in bad faith.' " United States v. Blodgett, 709 F.2d 608, 610 (9th Cir.1983), (quoting Barnd v. City of Tacoma, 664 F.2d 1339, 1343 (9th Cir.1982)). See also United States v. Assoc'd Convalescent Enters., 766 F.2d 1342, 1346 (9th Cir.1985); Optyl Eyewear Fashion Internat'l Corp. v. Style Cos., 760 F.2d 1045, 1048 (9th Cir.1985). The district court refused to make such a finding and we see no basis for holding that it abused its discretion.
 
 
 37
 Pomona also argues that it is entitled to sanctions under Rule 11 because several of the allegations raised in the complaint and at the outset of discovery--in particular, allegations concerning the existence of facts relevant to the Senate factors enumerated in Thornburg[18]--either later proved to be without foundation or were otherwise abandoned as the trial progressed.
 
 
 38
 Rule 11 sanctions are appropriate "only when the pleading as a whole is frivolous or of a harassing nature, not when one of the allegations or arguments in the pleading may be so characterized." Murphy v. Business Cards Tomorrow, Inc., 854 F.2d 1202, 1205 (9th Cir.1988) (rejecting Rule 11 sanctions where defendants argued that two allegations in amended complaint were plainly false). That some of the allegations made at the outset of the litigation later proved to be unfounded does not render frivolous a complaint that also contains some non-frivolous claims. See Golden Eagle Distr. Corp. v. Burroughs Corp., 801 F.2d 1531, 1540-41 (9th Cir.1986) (Rule 11 sanctions inappropriate where only a portion of an otherwise meritorious pleading, motion or paper is frivolous).
 
 VI. Conclusion
 
 39
 The district court's judgment is affirmed in all respects.
 
 
 
 [1]
 Two additional Hispanics were elected to the city council after the district court rendered its opinion: the first in 1987; the second in 1989. While we may take judicial notice of the results of these elections, contained in the reports of a public body, Fed.R.Evid. 201(b)(2), we may not, of course, rely thereon in reviewing the district court judgment
 
 
 [2]
 The district court found, for example, that the "overall success rate of hispanic candidates [to the city council] for the period from 1965-1985 was 33%, compared to a success rate of only 27.7% for white candidates." Romero, 665 F.Supp. at 860-61. The absence of any successful black candidates, the district court concluded, was the result of candidate selection and campaign strategies and not racial bloc voting. The district court also found that Pomona's electoral practices, such as open access to voter registration, bilingual ballots, absentee voting, single-shot or "bullet" voting and candidate residency requirements, encouraged the election of minority candidates, as did the absence of candidate slating. Id. at 861-62. Finally, the district court found that the government of Pomona has been responsive to the needs of racial minorities, and that Pomona's minorities have not been denied access to the candidate nominating process. The district court concluded that the inability of Hispanic, and in particular black, candidates to achieve greater success at the polls reflected the fact "that minority voters are neither very large [sic] nor very concentrated [in the city of Pomona]." Id. at 857. Indeed, "[u]nlike heavily segregated Southern cities, the City of Pomona is very 'integrated' as described by plaintiff, Tomas Ursua, thereby making it impossible to draw a 'safe' district for either hispanics or blacks." Id
 
 
 [3]
 Plaintiffs have not appealed the district court's ruling that Pomona's at-large districting plan violated neither 42 U.S.C. Sec. 1983 nor the fourteenth and fifteenth amendments. Defendants have not appealed the district court's denial of attorney's fees under sections 1973l (e) and 1988
 
 
 [4]
 Congress amended the Voting Rights Act in 1982 in response to the Supreme Court's decision in City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Bolden was a plurality opinion declaring that proof of discriminatory intent is not only essential to a vote dilution claim under the fourteenth and fifteenth amendments, but is also a necessary element of a claim brought under section 2 of the Act. A violation of section 2 can now be established
 if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 42 U.S.C. Sec. 1973(b) (as amended June 29, 1982) (emphasis original).
 The "totality of circumstances" referred to in section 2 incorporates the analytical framework established in the pre-Bolden cases of White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973) (en banc), aff'd sub nom. East Carroll Parish School Bd. v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam). These so-called "Zimmer" or "Senate" factors were enumerated in the Senate Report on the 1982 Voting Rights Act amendments:
 
 
 [1]
 the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
 
 
 [2]
 the extent to which voting in the elections of the state or political subdivision is racially polarized;
 
 
 [3]
 the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
 
 
 [4]
 if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
 
 
 [5]
 the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
 
 
 [6]
 whether political campaigns have been characterized by overt or subtle racial appeals;
 
 
 [7]
 the extent to which members of the minority group have been elected to public office in the jurisdiction
 Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:
 whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
 whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
 S.Rep. No. 417, 97th Cong., 2d Sess. 28-29 (footnotes omitted), reprinted in 1982 U.S.Code Cong. & Admin.News 177, 206-07.
 
 
 [5]
 See Thornburg, 478 U.S. at 36-37, 106 S.Ct. at 2758-2759; see also note 4 supra
 
 
 [6]
 Indeed, plaintiffs acknowledge that they followed United States v. Marengo County Comm'n, 731 F.2d 1546 (11th Cir.), appeal dismissed and cert. denied, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984), which recognized that it is essential for a plaintiff to prove racially polarized voting
 
 
 [7]
 We are aware of no successful section 2 voting rights claim ever made without a showing that the minority group was capable of a majority vote in a designated single district. See, e.g., White v. Regester, 412 U.S. at 768, 93 S.Ct. at 2340; Zimmer v. McKeithen, 485 F.2d at 1301. Indeed, the trial court in Gingles recognized that "no aggregation of less than 50% of an area's voting age population can possibly constitute an effective voting majority." 590 F.Supp. at 381 n. 3. Less than a majority, of course, might suffice in a district where candidates are elected by plurality
 
 
 [8]
 One of the issues listed in the pretrial conference order, signed by both parties, was "[w]hether Blacks [and Hispanics] are geographically distinct and numerous enough to determine the electoral outcome in a single-member race." Excerpts of Record (ER) CR 27, at 9. Plaintiffs are therefore precluded from arguing that they lacked notice that geographical compactness would be an issue. See Moylan, 292 F.2d at 705 (only "reasonably genuine surprise" justifies reopening of case)
 
 
 [9]
 This argument is crucial to plaintiffs' case because under their proposed 4-1 districting plan no minority group, when considering voting age and citizenship requirements, could make up a majority of a single district. See Romero, 665 F.Supp. at 858
 
 
 [10]
 The plaintiffs offered a variety of alternative districting plans to show that it was possible, using existing voter precinct lines but different city council district lines, to create single-member districts with heavy concentrations of minority voters. Two of the suggested plans (the 6-1 and 8-1 plans) proposed the redrawing of district lines and the creation of two or four additional city council seats. The third plan proposed redrawing the existing district lines without adding any seats to the city council (the 4-1 plan). The district court properly refused to consider any plans that expanded the number of seats on the city council. If proposed districting plans with additional district seats could be considered to prove a section 2 violation, there would be no case where geographical compactness could not be demonstrated by artful gerrymandering. See McNeil, 851 F.2d at 946
 
 
 [11]
 The district court found that, under plaintiffs' proposed 4-1 districting plan, the largest concentration of Hispanics (51%) was in District C. Once citizenship and voting age was considered, however, that number fell below 50%. Romero, 665 F.Supp. at 858
 
 
 [12]
 The evidence showed that, whether one considered existing districts or the population under the plaintiffs' proposed districting plan, it was impossible for them to construct a single district with a majority of one minority group, unless one considered raw population totals. Further, the district court found that plaintiffs' own homogeneous precinct analysis indicated that "in 1985, out of 25 precincts, none had over a 60% hispanic population. Most of the concentrated black precincts were only 62% black." Id. In short, Pomona is so integrated that it is impossible to construct a single-member district with a majority of black or Hispanic eligible voters
 
 
 [13]
 Raw population totals are relevant only to the extent that they reveal whether the minority group constitutes an effective voting majority in a proposed single-member district given such factors as low voter registration and turnout patterns. See, e.g., Ketchum v. Byrne, 740 F.2d 1398, 1413, 1415-16 (7th Cir.1984), cert. denied sub. nom. City Council v. Ketchum, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985) (minority population should be 65 percent of the total population in a district in order for the minority group to have the ability to elect candidates of its choice); see also United Jewish Orgs. v. Carey, 430 U.S. 144, 163-64, 97 S.Ct. 996, 1008-09, 51 L.Ed.2d 229 (1977) ("substantial nonwhite population majority--in the vicinity of 65%--would be required to achieve a non-white majority of eligible voters") (emphasis original)
 
 
 [14]
 Under plaintiffs' proposed 4-1 districting plan, the largest concentration of blacks and Hispanics (68%) would be in District C, where Spanish-surnamed residents numbered 51% and blacks 17%
 
 
 [15]
 The district court appears to have concluded that plaintiffs did not prove geographic compactness even if blacks and Hispanics were treated together. Romero, 665 F.Supp. at 858. The district court did not explain why this would be the case, in light of the fact that blacks and Hispanics would have comprised a 68% population majority in one district. We need not consider whether this finding was erroneous because we affirm the district court's finding that the two groups were not politically cohesive in any event
 Also, we express no opinion as to whether section 2's protections extend to a coalition of racial or language minorities. See Campos v. City of Baytown, 840 F.2d 1240, 1244 (5th Cir.1988) (holding that section 2 extends to protect coalition of black and Hispanic voters), cert. denied, --- U.S. ----, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989).
 
 
 [16]
 Plaintiffs launch a somewhat pro forma attack on the district court's findings and its denial of class certification. Neither issue warrants reversal of the district court's decision
 Plaintiffs argue that the district court erred in not discussing the existence of a white voting bloc and in not making detailed findings regarding the evidence on the "Senate" factors. However, because we affirm the district court's findings regarding lack of geographic compactness and cohesion, we need not consider this assignment of error.
 The district court denied class certification because it found that black and Hispanic voters in Pomona lacked commonality of interests, a showing required under Federal Rule of Civil Procedure 23(a)(2). Because we affirm the district court's dismissal of plaintiffs' case on the merits, the class certification issue is moot.
 
 
 [17]
 This included over $16,000 for "computer programming/data entry/computer usage for graphics, charts and maps," $6500 for a "voter survey," and approximately $22,904 for "research assistants" and "archive assistants". Supplemental Excerpts of Record (SER) at 4-5. Of the roughly $147,000 in expert witness fees charged Pomona, $99,000, or 67 percent, was for "research and analysis" conducted by the experts themselves. SER 6-7
 
 
 [18]
 Plaintiffs alleged either in their complaint or at the outset of discovery that (a) Pomona intentionally adopted and maintained the at-large system for the purpose of discriminating against black and Hispanic residents; (b) racial appeals were made by white candidates in Pomona City Council elections; (c) Pomona officials were not responsive to the needs of its minority citizens; (d) the tenuous justifications for Pomona's adoption and maintenance of its at-large system suggested discriminatory motivation; and (e) the city council's staggered term elections had a discriminatory effect on the ability of blacks and Hispanics to effectively exercise their franchise