**Jesse Campos, W.R. (Resendez) MORRIS, and Mexican American Bar Association of Houston, Plaintiffs,**

**v.**

**CITY OF HOUSTON, et al.[1], Defendants.**

**Civ. A. No. H-91-0885.**

United States District Court,
S.D. Texas,
Houston Division.

July 31, 1995.

---

1. In addition to Robert C. Lanier, the Mayor of Houston, the plaintiffs in their original petition named all City Council members elected in 1991. Although Lanier is still Mayor, many of the persons serving on the city council at the filing of this lawsuit are no longer on the council.

Frumencio Reyes, Jr., Reyes & Reyes–Castillo, Houston, TX, for plaintiffs.

Myra A. McDaniel, Bickerstaff Heath & Smiley, Austin, TX, C. Robert Heath, Bickerstaff Heath & Smiley, Austin, TX, for defendants.

Gerald W. Jones, Washington, DC, for amicus U.S.

Barry Milton Barnes, Barnes & Turner, Houston, TX, for amicus Sylvester Turner.

Michael John Zomcik, Fibich & Garth, Houston, TX, for movant.

## ORDER

HITTNER, District Judge.

Pending before the Court is the Second Motion for Summary Judgment filed by defendant the City of Houston. Having considered the motion, the submissions and the applicable law, the Court determines that the motion should be granted.

Plaintiffs Jesse Campos, W.R. (Resendez) Morris, and Mexican American Bar Association of Houston (hereinafter collectively referred to as "Campos") filed the instant action against the City of Houston challenging the 9–5–1 (9 district seats, 5 at-large seats, 1 mayor) election scheme. Plaintiffs allege that the city's election plan violates Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq. (as amended 96 Stat. 134) because it discriminates against Hispanics—prohibiting them from representation on the City Council in proportion to their population in the community.

The City of Houston filed the instant motion for summary judgment arguing that plaintiffs cannot establish a genuine issue of material fact as to each element of the voter dilution claim and thus, their complaint should be dismissed. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir.1990).

The United States Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) set forth mandatory prerequisites which must be established by a plaintiff in a Section 2 voter dilution claim. Specifically, the Court held that in order to make a successful Section 2 voter-dilution claim, a three-part test must be satisfied:

1. The minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.

2. The minority group must be able to show that it is politically cohesive.

3. The minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, usually to defeat the minority's preferred candidate.

*Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766.

The *Gingles* factors initially related to multi-member districts. However, the Supreme Court has subsequently held that the *Gingles* factors also apply to single-member districts. *Growe v. Emison,* — U.S. ——, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993); *see also Voino-*

*vich v. Quilter,* —— U.S. ——, ——, 113 S.Ct. 1149, 1157, 122 L.Ed.2d 500 (1993). The City of Houston currently has in place a mixed-district plan—with 9 single-member districts and 5 at-large seats. Defendants state that this Court must decide whether it is possible, in an all single-member district plan, to create a greater number of single-member districts with a majority of Hispanic voters than there are Hispanic council members serving under the current system (regardless of the at-large seats). If the answer is no, states the City of Houston, then the cause of the alleged vote dilution is not the election structure, and the plaintiffs have not stated a valid cause of action.

The City of Houston argues that plaintiffs cannot establish a genuine issue of material fact on their Section 2 claim. In order to establish a Section 2 claim, plaintiffs must first create a fact issue on each of the three *Gingles* prerequisites. Failure to do so on even one of the three prongs entitles the defendants to entry of summary judgment.

**(1) Is the minority group sufficiently large and geographically compact to constitute a majority in a single-member district?**

■ The City of Houston first argues that plaintiffs cannot establish that there is a genuine issue of material fact concerning this first factor. In order to establish an issue of material fact plaintiffs are required to provide evidence demonstrating the possibility of creating a greater number of single-member districts with a majority of Hispanic voters than there are Hispanic council-members serving under the current system. Currently, there are three Hispanic City Council members, two of whom were elected at-large, and one who was elected from a single-member district.

Plaintiffs argue that they have met this burden by providing evidence that Houston's Hispanic population comprises 28 percent of the city's population and is thus, sufficiently large to create a majority in four single-member districts. However, the City argues that the relevant inquiry is not the total number of voting age Hispanics but rather, the total number of voting age Hispanic citizens. Defendants have provided evidence indicating that according to 1990 Census data, 45.8 percent of all Hispanics of voting age in the City of Houston are non-citizens compared to 2.2 percent of the non-Hispanic Anglo voting age population, and 1.6 percent of the non-Hispanic African American voting age population. *See* Affidavit of Norfleet (Bill) Rives, Ph.D. ("Rives") at 2.

Plaintiffs challenge the data relied upon by the City to reach this conclusion. Plaintiff's expert, Robert Brischetto, Ph.D. ("Brischetto") states in his affidavit:

> I have had an opportunity to examine the census tapes which the City of Houston claims supports the allegations regarding the numbers of Hispanic Citizens of voting age. While I believe the City projections are in the general ball park, my reading of the information is different from that of the City's expert. Thus, I am unable to confirm the accuracy of the projections which the City makes from these data.

*See* Affidavit of Brischetto at 9.

The United States Supreme Court has held that although inaccuracies are inherent in Census data, use of this data is not inherently unreliable. *Gaffney v. Cummings,* 412 U.S. 735, 746, 93 S.Ct. 2321, 2328, 37 L.Ed.2d 298 (1973). In addition, to depart from using Census data in redistricting cases, the Supreme Court places a heavy burden on the party opposed to such data to establish why this data is inappropriate. *Kirkpatrick v. Preisler,* 394 U.S. 526, 534–35, 89 S.Ct. 1225, 1231, 22 L.Ed.2d 519 (1969). In this instance, Brishetto's statement regarding the City's use of the census data in determining the percentage of voting age Hispanic citizens is the only argument offered by plaintiffs to convince the Court that this data should not be used. However, the plaintiffs fall short of meeting their burden of establishing that use of this data is inappropriate.

Plaintiffs further argue that the very use of voting age citizen percentages, rather than total voting age population data, in analyzing the motion for summary judgment impermissibly violates the Equal Protection Clause of the United States Constitution. Specifically, plaintiffs contend that the City is seeking to have this Court create a new rule applicable

only to the Hispanic population that would require assessment of that group's right to representation under the Voting Rights Act and the United States Constitution in a manner different from all other populations in the state. This in essence, argue the plaintiffs, would require that only the Hispanic community would have to demonstrate the viability of a district by showing a clear citizenship voting age population majority before liability in a Section 2 voting rights case could be established.

The Court disagrees with the plaintiffs' analysis that using voting age citizen population data in voting rights cases is a new rule of law. Section 2(a) of the Voting Rights Act states that:

[n]o voting qualification or prerequisite to voting or standard, practice or procedure shall be imposed ... which results in a denial or abridgement of the right of any citizen of the United States.

42 U.S.C. § 1973 (emphasis added).

The plain language of this statute indicates that Congress intended the protection of the voting rights act to apply only to citizens. In fact, the Supreme Court in *Gingles,* stated explicitly that: "Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Gingles,* 478 U.S. at 50, n. 17, 106 S.Ct. at 2767, n. 17. The Fifth Circuit has also held that "eligible minority voter population, rather than total minority population, is the appropriate measure of geographical compactness." *League of United Latin Amer. Citizens v. Clements,* 986 F.2d 728, 743 (5th Cir.1993), *rev'd on other grounds,* 999 F.2d 831 (5th Cir.1993) (en banc) (emphasis added) (quoting *Romero v. City of Pomona,* 883 F.2d 1418, 1425 (9th Cir.1989) (stating that *Thornburg* repeatedly refers to effective voting majorities, rather than raw population totals as the touchstone for determining geographical compactness)). Thus, in analyzing the first prong of the *Gingles* test, the Court determines that using data of voting age Hispanic citizens is the correct measure of the Hispanic population's ability to create a majority voting district.

■ Defendants argue that using the voting age citizen data, Hispanics are currently represented in a greater proportion on the City Council as compared to their voting population. Rives states in his affidavit for the City of Houston that it does not appear possible to draw three single districts with a majority Hispanic voting-age citizen population, and that it is clearly impossible to draw four. *See* Rives affidavit at 5.

On the other hand, plaintiffs' expert, Brischetto, argues that: "[i]t is not difficult to draw a plan of apportionment for the City of Houston which will produce four districts in which hispanics will have the *opportunity* to elect the candidate of their choice." *See* Brischetto affidavit at 14 (emphasis added). However, *Gingles* clearly states the plaintiff is required to establish that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district, not merely to have an opportunity to elect the candidate of their choice. More importantly, Brischetto's analysis did not take into account the large percentage of non-citizen voting age Hispanics which greatly impacts the analysis of plaintiffs' claim.

The most recent census data indicate that 45.8 percent of all Hispanics over age 18 in the City of Houston are non-citizens. At the time plaintiffs filed their original complaint, Hispanics occupied 21.4 percent (or three seats) of the City Council's 14 seats (Ben Reyes, Graciela Saenz and Cynthia Canales Gorczynski[2]). *See* Rives affidavit at 1–4. In the 1993 City Council election, three Hispanics were elected to the City Council, Ben Reyes, Graciela Saenz, and Felix Fraga. Two of these candidates were elected to at-large seats. Thus, Hispanics currently hold 21.4 percent of the City Council seats while only 15.3 percent of that population are voting age citizens. To sustain the voter dilution claim, plaintiffs would have to establish that they could constitute a voting majority in more single member districts than there are current Hispanic City Council members.

**2.** Council Member Gorczynski was appointed to the City Council.

**1066**

As the summary judgment evidence provided does not establish that there is a genuine issue of material fact concerning plaintiffs' ability to do so, the Court determines that the plaintiffs have failed to meet their summary judgment burden.

### (2) Are Hispanics in Houston politically cohesive?

▮▮▮ Plaintiffs are also required to establish under *Gingles* that the minority group in question is politically cohesive. Statistical evidence of racially-polarized voting is appropriate in analyzing the second and third prongs of the *Gingles* test. *Gingles*, 478 U.S. at 52, 106 S.Ct. at 2767.

Statistical evidence indicates that Hispanics overwhelmingly vote for Hispanic candidates. According to Rives, in 1991 Graciela Saenz won an at-large seat on the City Council. She received 51.4 percent of the Hispanic vote in an eight-person general election and 80 percent of the Hispanic vote in the run-off. *See* Rives affidavit, schedule six. Brischetto reports that Saenz won either 93 or 99 percent (depending on which type of analysis was utilized) of the Hispanic vote during the run-off. *See* Brishetto affidavit, exhibit B. This statistical evidence indicates that Hispanics are politically cohesive.

### (3) Does the white-bloc majority vote sufficiently to *usually* defeat the minority's preferred candidate?

▮▮▮ To determine whether there is a genuine issue of material fact relative to the final prong of the *Gingles* test, the Court will consider only run-off elections and elections between two candidates for the purposes of this section, as a general election does not lend itself to a cohesive statistical analysis. The multitude of minority and non-serious candidates may confuse the analysis of whether Anglos vote as a bloc to defeat the minority's candidate of choice. The "mean-

ingful" election, with two "serious" candidates, does not usually occur until two candidates with the largest amounts of plurality support campaign against each other.

In analyzing this portion of the *Gingles* three part test, the import of the word "usually" cannot be underestimated. According to Brischetto, in the four elections cited in the plaintiffs' brief in which Hispanics were serious candidates, Anglos supported Hispanic candidates two out of four times. *See* Brischetto affidavit at 2–5. These elections are the 1981 mayoral election, a 1989 City Council at-large election, and two 1991 City Council races. Thus, plaintiffs' data indicates that 50 percent of the time, Anglos supported Hispanic candidates. These numbers do not support the proposition that Anglo's *usually* vote as a bloc to defeat Hispanic candidates.[3]

Plaintiffs attempt to rationalize the statistics, which indicate that Anglos support Hispanic candidates approximately 50 percent of the time, by arguing that in those instances Anglo voter turnout was either very low or the other candidate was African American. Plaintiffs' attempts to explain away the numbers that impede their argument are not convincing. Pursuant to *Gingles*, the inquiry is whether the white bloc majority *vote* sufficiently to usually defeat the minority's preferred candidate, regardless of proffered theories for why they did so in a particular election, absent special circumstances. *Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766–67. Therefore, only those who have actually voted can be included in this assessment, notwithstanding that the opponent was African American.

The Supreme Court in *Gingles* did recognize that "special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting,[4] may explain mi-

---

3. The City of Houston argues that since the filing of the original complaint, the 1993 city council election took place, in which according to the defendants, Anglos supported another Hispanic candidate (Felix Fraga). However, defendants' failed to provide any data or statistical analysis in support thereof. Thus, the Court will not consider the 1993 City Council election in analyzing the summary judgment evidence on the third prong.

4. Bullet or "single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates." *Gingles* at 478 U.S. at 39 n. 5, 106 S.Ct. at 2760 n. 5 (quoting *City of Rome v. United States*, 446 U.S. 156, 184, n. 19, 100 S.Ct. 1548, 1565, n. 19, 64 L.Ed.2d 119 (1980) (quoting United States Commission

nority electoral success in a polarized contest." *Id.* at 57, 106 S.Ct. at 2770. In the instant case, the factors constituting "special circumstances" were not present. Thus, on this third prong of *Gingles,* the plaintiffs have failed to establish a genuine issue of material fact.

Establishment of the *Gingles* factors is not in and of itself sufficient to establish liability under Section 2. *Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991); *Citizens for Better Gov't v. City of Westwego,* 946 F.2d 1109, 1116 (5th Cir.1991) (*Westwego III* ). "Plaintiffs must also show that, under the 'totality of circumstances,' they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." *League of United Latin Amer. Citizens v. Clements,* 999 F.2d 831, 849 (5th Cir.1993) (en banc). To determine the totality of the circumstances, the Court is guided by a laundry list of factors known as the *Zimmer* factors, derived from *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973), *aff'd sub nom East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).[5] These factors include:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process; whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some instances have had probative value to establish a violation are: (1) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (2) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. S.Rep. No. 417, 97th Cong., 2d Sess. 28–29 (1982), *reprinted in* U.S.Code Cong. & Admin.News 1982, 177, pp. 206–07.

Plaintiffs spend considerable time arguing that the *Zimmer* factors support their Section 2 claim. However, unless a plaintiff in this type of action first establishes a genuine issue of material fact on all three of the *Gingles* prongs, the Court need not reach the *Zimmer* factors. *Overton v. City of Austin,* 871 F.2d 529, 538 (5th Cir.1989). Thus, in the instant case, as plaintiffs have not established a genuine issue of material fact as to all three parts of the *Gingles* test, summary judgment is appropriate to dispose of their Section 2 Voting Rights Act cause of action. *See Gingles,* 478 U.S. at 48, 106 S.Ct. at 2765. Accordingly, the Court hereby

ORDERS that the Motion for Summary Judgment is GRANTED.

### *FINAL JUDGMENT*

As the defendants' motion for summary judgment has been granted, the Court

---

on Civil Rights, The Voting Rights Act: Ten Years After, pp. 206–07 (1975)).

**5.** These factors are also stated in the Senate Report accompanying the amendment to § 2. *Marshall,* 424 U.S. at 639, 96 S.Ct. at 1085.

GRANTS summary judgment in favor of defendants, the City of Houston, et al., pursuant to Fed.R.Civ.P. 56(c).

This is a FINAL JUDGMENT.